Filed 10/9/24 Welty v. Offspring CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RON WELTY, | B328648 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV34993) |
| v. | |
| OFFSPRING, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, William F. Fahey, Judge. Affirmed.

Thigpen Legal and Jordanna G. Thigpen for Plaintiff and Appellant.

King, Holmes, Paterno & Soriano, Howard E. King and John G. Snow for Defendants and Respondents Offspring, Inc.; The Offspring; 1265 Productions, Inc.; Bryan Holland; and Kevin Wasserman.

George Cooper Rudolph for Defendant and Respondent Gregory Kriesel.

\* \* \* \* \* \*

Ron Welty appeals from a judgment against him in this action for breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty and related causes of action brought by Welty against Offspring, Inc.; The Offspring; 1265 Productions, Inc.; Bryan Holland; Kevin Wasserman; and Gregory Kriesel (collectively respondents). The trial court held various proceedings over two and a half years including a bifurcated hearing on contract interpretation, a motion for summary adjudication of certain issues, and a bench trial. Following the proceedings, judgment was entered in favor of respondents. The court later granted respondents' motion for contractual attorney fees and costs. Welty also separately appealed from the order granting respondents' attorney fees. This court consolidated the two matters.

Finding no reversible error, we affirm the judgment in full.

### FACTUAL BACKGROUND

Welty is a former drummer for the band known as The Offspring. Welty was a member of The Offspring from 1987 to 2003, during which time the band released six albums. After Welty was terminated, the band released four more albums.

**Contracts**

In March 2004, Welty and respondents entered into a "Settlement Agreement and Mutual General Release of All Claims" (SA). Paragraph 2 of the SA described various payments

2

that Welty was entitled to receive after the date he disassociated from the band. Welty agreed he would "not share in any revenue derived by the Group or any Entity from any source not expressly described" in the SA.

All master recordings embodying Welty's musical performances as a member of the band were referred to as the "Welty Masters."[1] All master recordings in the album entitled "Splinter" were known as "the "Splinter Masters."[2] The term "Masters," within the SA, was defined to mean "the Welty Masters, the Splinter Masters, and the master recordings embodied on LP5 and LP6" or replacements of those albums.[3]

The SA provided a formula to determine Welty's share of a future catalog sale. The formula provided Welty's share "shall be determined by multiplying the Nonallocated License fee received by the Group by a fraction, the numerator of which shall be the number of U.S. SoundScan sales of the Group Albums embodying solely Masters during the immediately preceding three (3) year period (the '**Test Period**') and the denominator of which shall be the number of U.S. SoundScan sales of all Group Albums embodying master recordings, including the Masters, during the

---

[1] Welty was contractually entitled to 25 percent of net royalties resulting from exploitations of the Welty Masters.

[2] Welty was contractually entitled to 20 percent of the revenue derived from the Splinter album, which was released in 2003.

[3] Welty was contractually entitled to 10 percent of the revenue derived from LP5, which was released in 2008, and 5 percent of LP6, which was released in 2012.

Test Period (the '**Test Period Fraction**'), and applying the applicable Welty share(s) to the product."

The Offspring released a "Greatest Hits" album in 2005 (GHLP). In anticipation of the release of GHLP, respondents and Welty entered into an agreement entitled "Greatest Hits Advance Allocation" (GHAA). The GHAA was created "for purposes of allocating as among [Welty] and [respondents] the advance" regarding the GHLP payable by Sony Music (Sony). The GHAA designated 3/16 of the advance towards new material and expressly provided that Welty "shall not share in that allocation, but [Welty] will share in the remainder of the Hits Advance." The new material constituted "new previously unreleased recording" that respondents intended to release on the GHLP. The net amount payable to Welty under the GHAA was $221,239.06.

**Accounting**

Before February 2010 The Offspring's business manager was certified public accountant Lisa Ferguson. Thereafter, The Offspring hired Michael Karlin and Peter Fugedi of Nigro Karlin (NKTSB). Welty hired Ferguson in 2003. Implementing the parties' contracts was part of the business managers' jobs. Karlin admitted there were payments to Welty that were untimely made. He also conceded Fugedi made mistakes when paying Welty. Karlin was unaware if Welty was receiving accountings as provided in the agreement. Ferguson recalled having a specific conversation with Fugedi in 2010 about why she was not receiving certain royalties for Welty. She recalled mentioning many times to Fugedi that Welty was not receiving royalties due, without a response from Fugedi. Ferguson also complained Welty was not receiving accountings as required.

4

**Sale of catalog**

Laurie Soriano of King, Holmes, Paterno & Soriano negotiated a sale of The Offspring's catalog in 2015 with a company known as Round Hill Music (Round Hill). Soriano testified the sale was a "$35 million aggregate transaction." The transaction consisted of the master catalog, valued at $20 million, and the publishing catalog, valued at $15 million. Welty's representatives alerted Soriano there were royalties owed to Welty. Respondents initially calculated Welty was owed approximately $3 million of the $20 million sale of the master catalog. A few weeks later a revised calculation was sent, showing Welty was owed $2,456,521.11. In December 2016, respondents delivered a payment of $1,282,405.67 to Welty, along with a letter explaining respondents' calculations.

## PROCEDURAL HISTORY

**The complaint**

Welty's September 2020 complaint alleged the following:

First, respondents underpaid him his share of the sale proceeds from the catalog sale. Respondents wrongly excluded all proceeds from the sale of the GHLP in their calculation of Welty's share and intentionally misallocated proceeds from the sale price paid by Round Hill as between publishing, recording rights, and other rights. Further, respondents received forgiveness of at least $7,981,583.18 in recoupable advances as part of the sale of the Masters and failed to benefit Welty for the forgiven sum.

Welty also alleged respondents disregarded the SA and the GHAA and deliberately underpaid him for his share of proceeds from sales of the GHLP. In addition, respondents received a substantial payment from Sony resulting from the sale of its

5

equity interest in Spotify and to date had refused to account for that payment to Welty.

In the first cause of action for breach of contract, Welty alleged respondents breached the SA and GHAA by failing to account to Welty, provide third party accounting statements, and pay Welty his share within 90 days as required. Further, respondents failed to cause third parties to pay Welty as required and misallocated sales proceeds.

In the second cause of action for breach of good faith and fair dealing, Welty alleged there was an implied promise of good faith and fair dealing, which respondents breached in connection with both the SA and the GHAA.

In the third cause of action for breach of fiduciary duty, Welty alleged that in relinquishing his rights in The Offspring and its business entities, Welty placed his trust and confidence in respondents who were required to fully and accurately account to him and pay him in accordance with the terms of the SA and GHAA.

In the fourth cause of action for constructive fraud, Welty alleged respondents received accounting statements and intentionally concealed those statements and the resulting payments from Welty. In addition, they intentionally misallocated the weighing of the purchase price for the catalog sale to artificially increase the price of the purchasing rights, thus diminishing Welty's contractual share of the publishing rights.

In the fifth cause of action for conversion, Welty alleged respondents received in trust 31 or more accounting statements and corresponding funds, which respondents wrongfully retained for themselves. Further, respondents withheld money they were

6

obligated to pay Welty, without his consent, thus exercising dominion and control over his property.

In the sixth cause of action for accounting, Welty sought a full and accurate accounting, which he alleged would demonstrate respondents owed him at least $2,885,775.65 or more. Welty also sought declaratory relief setting forth the parties' respective rights and obligations.

Welty prayed for judgment in the amount of at least $2,885,775.65 or more in an amount to be determined at trial, for punitive damages and interest at the legal rate.

Following the filing of this action, Vince Leoni of Miller Kaplan conducted an accounting. Respondents provided statements and paid Welty money owed to him.

**Discovery and bifurcation**

The parties conducted discovery for more than a year before discovery closed on December 6, 2021. The court set a final status conference for December 17, 2021, and a trial date of January 3, 2022. The parties filed witness lists, exhibit lists, and other trial documents before the December 17, 2021 final status conference.

In November 2021, respondents filed a motion to bifurcate trial pursuant to Code of Civil Procedure sections 598 and 1048, subdivision (b). Regarding matters of contract interpretation, respondents sought to bifurcate "the parties' respective rights and obligations under the [SA], including: (1) how to properly calculate Welty's share of the proceeds from Holland, Wasserman, and Kriesel's sale of certain master recordings under Paragraph 3 of the [SA], and (2) whether the payment made to Welty from that sale 'should be treated as distributions by a partnership to a partner, thus necessitating the Offspring

7

Partnership to furnish a Schedule K-1, and not a Form 1099, to Welty in connection with those payments.'" On December 8, 2021, the trial court granted the motion, expressing its intention to try the first and third causes of action in the first phase. The court also noted: "The sixth and seventh causes of action for accounting and declaratory relief also raise equitable and/or purely legal claims for the court's resolution. The equitable defenses in the answer, including statute of limitations, laches, and unclean hands would also be tried first."

**Hearing on contract interpretation issues**

At the December 17, 2021 status conference, the court determined it would first decide questions of law regarding the parties' contract before conducting trial on other issues. The court ordered the parties to submit two rounds of briefing on the legal issues. The hearing was set for January 28, 2022. The court did not limit the issues to be considered, explaining, "I need some detail in your respective pretrial reports on this potential contract ambiguity issue. And who—and what the ambiguities are. I mean, chapter and verse which clause and which paragraph. What Plaintiff's version of the ambiguity is versus the defense's version." In its minute order of December 17, 2021, the court ordered the parties to "file simultaneous briefs re: legal issues," then later to "file simultaneous responses." The parties ultimately filed "two rounds of extensive briefing on contract interpretation." The court explained, "Welty argue[d] that the legal question before the Court is 'narrow.'" The court described the primary issue laid out by Welty as "whether sales from the [GHLP] should be included when calculating [Welty's] share from the 2016 sale of the band's catalog to Round Hill."

8

The SA provided a formula to determine Welty's share of a future catalog sale, which required the use of the Test Period Fraction. In his brief, Welty argued the GHLP should have been included in the numerator for the Test Period Fraction even though it did not encompass solely "Masters" as that term was defined in the SA. Welty argued the GHAA essentially amended the SA by considering the sole non-Welty master recording on the GHLP to be a "Master." Respondents disagreed, arguing the GHAA did not amend the definition of "Masters" in the SA. Thus, because the GHLP was not an album "embodying solely Masters," it was properly excluded from the numerator in the Test Period Fraction.

The hearing on the contract interpretation issue was held on January 28, 2022. The court noted, "both of you appropriately briefed the case law in California which—and I'm going to paraphrase it—the Court can provisionally and should maybe provisionally consider extrinsic evidence to determine if there's an ambiguity. . . . If we go down that road, what's the plaintiff's position as to what extrinsic evidence should be provisionally considered?" Welty's counsel referenced the evidence included in their papers, including testimony, e-mails, and other documents submitted in the record. The court then clarified, "doesn't the case law also teach that extrinsic evidence should be considered only if it occurred either by statements or documents before the controversy arose?" Welty's counsel agreed. The court then stated, "with that additional consideration in mind, what extrinsic [evidence] do you believe [Welty] has proffered that the Court should consider?" Welty's counsel responded, referring to "emails between the counsel . . . where counsel is conceding that the GHAA is in fact an amendment to the [SA]." The court asked

9

counsel to clarify what exhibit that was, and Welty's counsel informed the court it was exhibit 6. The court then stated, "Anything else that you believe the Court should provisionally consider?" Welty's counsel referenced exhibit 12, which had "the lead singer, when he is presented with the band manager calculations showing that Mr. Welty is owed approximately $3 million from the catalog sale, he responds with, '. . . we should have put out another record to skew those records.'" Respondents took the position there was no material ambiguity in the SA, and the GHAA did not modify or amend the SA.

The court filed its statement of decision on the contract interpretation issues on February 8, 2022. The court noted the parties disagreed as to whether the court needed to consider extrinsic evidence in resolving the contractual dispute. Welty's counsel asked the court to consider Exhibits 6 and 12. The court described each piece of evidence and stated, "nothing about Ex. 6 and Ex. 12 makes the language in the GHAA 'reasonably susceptible' to Welty's interpretation of its meaning." Having provisionally considered the two exhibits, the court determined "they will not be admitted on the issue of contract interpretation." The court noted that even if admitted, they did not support Welty's argument that the GHAA modified the term "Masters" in the SA.

The court stated, "without clear evidence or further explanation, the court cannot conclude that the objective intent of the parties was to fully incorporate and then modify terms in the [SA]." The court concluded as a matter of law that the GHAA does not modify the term "Masters" in the SA in the manner advanced by Welty, nor does the GHAA mention or purport to modify that definition.

10

Welty filed objections to the court's decision, which the court overruled. Welty's counsel argued the court did not consider all of his extrinsic evidence, "including all testimony, e-mails and other documents submitted in the record." The court responded it "trust[ed] [counsel] as to which particular exhibits," and "when I instructed . . . that the only two that you were relying on were 6 and 12, you did not object or in your closing comments make a further comment." The court stated, "the transcript clearly shows that based on the court's specific questions to plaintiff's counsel, the proffer of extrinsic evidence was narrowed to two exhibits only upon which this court ruled in its statement of decision."

**Status conference; motion to reopen discovery**

A status conference was held on May 5, 2022. The court proposed a bench trial on the accounting and declaratory relief claims dealing with Welty's position that respondents falsely increased the value of the publishing side of the catalog sale and there were unpaid or underpaid outstanding royalties, among other things. The court also mentioned respondents' intent to seek summary adjudication (MSA) on the second through fifth causes of action, and stated, "depending on the outcome of that, we would determine what issues remain, if any, for a potential jury trial." Welty's counsel objected on grounds the time to file an MSA had passed. The court disagreed that an MSA was untimely, explaining, "after we vacated the first trial date and we haven't formally set even a new trial date on a bifurcated portion, the court has discretion to allow for a summary judgment motion that is properly noticed." The date of August 17, 2022, was reserved for the hearing on the MSA, and the court set

October 10, 2022, as the trial date on the sixth and seventh causes of action.

On May 11, 2022, respondents provided Welty with a redacted copy of the SA, which was apparently provided to Round Hill during negotiations for the purchase of The Offspring's master catalog. Welty's counsel sought further information regarding the context in which the redacted agreement was shared from respondents' counsel. Welty's counsel thereafter filed a motion to either reopen discovery, or to confirm discovery was still open. Counsel also requested to withdraw from the case.[4]

On August 1, 2022, Welty's motion to reopen discovery was heard and denied.

**MSA**

On June 3, 2022, respondents filed an MSA to the first five causes of action. As to the first cause of action for breach of contract, respondents argued since the trial court determined Welty's interpretation of the contract was incorrect, Welty's breach of contract claim failed as a matter of law. As to the second cause of action (breach of the implied covenant of good faith and fair dealing), respondents argued the acts Welty complained of were specifically permitted by the agreement, therefore could not constitute a breach of the implied covenant as a matter of law, setting forth in detail the acts complained of and the reasons such acts were authorized under the agreement. As to the third cause of action (breach of fiduciary duty), respondents argued Welty could not establish the existence of a fiduciary relationship as a matter of law. As to the fourth cause

---

[4]    On August 4, 2022, Welty substituted new counsel.

12

of action (constructive fraud), respondents argued Welty could not, as a matter of law, establish the existence of a fiduciary or confidential relationship between the parties—a required element of the cause of action. Finally, as to the fifth cause of action (conversion), respondents argued failure to make a contractually required payment is insufficient basis for a cause of action for conversion as a matter of law.

On August 25, 2022, after briefing and oral argument, the trial court filed a written order granting respondents' MSA in part. The court granted summary adjudication as to breach of contract based on the master catalog sale, breach of fiduciary duty, constructive fraud, and conversion.

As to the breach of contract claim based on the sale of the master catalog, the trial court explained, "as [respondents] argue, the Court has ruled that [Welty's] interpretation of the GHAA and [SA] was wrong. Further, [respondents] have provided the declaration of attorney Paterno and his calculation of the amount due [to Welty]. [Welty] has not objected to Paterno's testimony and otherwise has no admissible evidence that Paterno's calculation is incorrect." The trial court further clarified Welty could not at that late time "raise new legal theories which purportedly support his claim of underpayment on the Round Hill deal." Thus, there were no triable issues of material fact as to this issue. The court specified that summary adjudication was granted as to breach of contract "solely on the theory that [Welty] was underpaid on the Round Hill deal and is otherwise denied as to [Welty's] additional theories in the first cause of action."

As to breach of the implied covenant of good faith and fair dealing, the trial court denied summary adjudication, noting Welty's complaint alleged respondents "failed properly to account

13

for and then pay [Welty] his fair share of royalty payments from third parties." Respondents did not address this issue in their MSA, therefore summary adjudication was denied.

As to breach of fiduciary duty and constructive fraud, the trial court granted summary adjudication, noting Welty failed to address "the relevant cases which hold that a contractual relationship, even one where there is a contingent future compensation agreement, does not give rise to a fiduciary relationship."

Summary adjudication was also granted as to conversion. The court noted Welty's arguments and "one case authority" were not persuasive.

**Pretrial proceedings**

At the September 30, 2022 final status conference, the court noted the upcoming trial dealt with the sixth and seventh causes of action for accounting and declaratory relief, and various affirmative defenses. The court clarified its ruling on the MSA prohibited Welty from producing any evidence at trial related to the catalog sale issue, noting Welty provided no competing calculation opposing respondents' calculation at the time of the MSA: "having ruled on the breach of contract issue, solely with respect to the 2015 catalog sale, that's off the table for a trial and for the accounting. And if it wasn't clear to the parties at that time, the accounting and dec [*sic*] relief actions will go forward on your so-called third-party issues, not the Round Hill sale."

On October 4, 2022, Welty filed a motion to file a first amended complaint purporting to add new theories regarding the 2015 catalog sale. The motion was to be heard on the date set for commencement of the bench trial. Respondents opposed the motion as untimely, prejudicial, and Welty failed to assert these

theories prior to the hearing on the catalog sale contract interpretation issue in January 2022.

At the October 17, 2022 hearing, the trial court denied Welty's motion to amend the complaint, as the issue "was resolved via the briefing and the court's ruling" on January 28, 2022. In response to Welty's counsel's comments that the briefing was restricted to the Test Period Fraction issue, the court noted, "I did not constrain . . . briefing at all." "I'm going to stick with the ruling that I think I made several times now as to the limitations of what this phase one trial will be about."

**Bench trial and decision**

The five-day bench trial commenced on October 17, 2022. Welty called 12 witnesses and respondents called one. Fifty-four exhibits were entered into evidence. The parties filed posttrial briefs and closing arguments were heard on December 22, 2022.

On January 12, 2023, the trial court issued a written statement of decision on the phase 1 trial, rejecting Welty's claim the 2015 catalog sale was designed to deprive him of his fair share. The court found Welty did not meet his burden of proof on this issue, providing "no evidence, only speculation, that the asset purchases by Round Hill were designed to deprive him of his 'fair share.' Welty introduced no testimony to support his theory." On the contrary, extensive evidence established the deal was structured in accordance with industry standards.

As to the claim of breach of implied covenant of good faith and fair dealing, the court noted various contractual provisions gave respondents sole discretion to make decisions regarding the catalog, and the Masters, without Welty's consent. The court noted, "In sum, under the clear terms of the SA . . . the band had unfettered discretion to not sell the [M]asters, to sell them for

15

$1.00 or, as here, to sell them for $20 million at the same time Holland sold his publishing catalog for $15 million. Welty retained no right to be heard on or to contest the band's decision, he retained no right to share in the $15 million sale of the publishing catalog and, as a matter of law, he has no recourse under a theory of breach of the implied covenant."

The court also found against Welty on theories he was owed royalties from third parties. Certain claims were barred by the parties' "agreed-upon three year statute of limitations." The court found the evidence did not support Welty's claims he was underpaid from SoundExchange or Sony, nor did Welty prove that he was damaged as to off-statement royalties. As a result of these findings, Welty's request for prejudgment interest as to SoundExchange, Sony and off-statement royalties was also rejected.

Respondents were the prevailing parties in the phase 1 trial.

**Hearing on remaining issues**

On February 28, 2023, the court held a hearing on whether substantive issues remained. Welty requested a phase 2 trial on two issues: one dealing with breach of the covenant of good faith and fair dealing, which the trial court felt had been thoroughly addressed, and a second issue related to various alleged breaches of the SA. The court again stated its position there was nothing left to resolve on these issues, but permitted Welty to argue otherwise.

The court then denied Welty's request for a phase 2 trial.

**Final statement of decision**

On March 6, 2023, the court entered a final statement of decision that addressed Welty's claims for royalties, his claim he

16

was entitled to a share of the $15 million Round Hill paid to Holland for his publishing catalog, and the affirmative defenses of statute of limitations, laches and waiver.

The court determined Welty did not meet his burden of proof regarding his contentions, and there were no remaining issues to be tried in a phase 2 proceeding. Accordingly, judgment was entered in favor of respondents.

**Attorney fees and costs**

Respondents sought attorney fees and costs based on a provision in the SA entitling the prevailing party to attorney fees.

On July 7, 2023, the trial court issued a written ruling granting respondents' motion for attorney fees. After considering the arguments of the parties, the court awarded respondents, except Kriesel, $724,947 in attorney fees and $20,013 in expert costs. Kriesel was awarded $131,871 in attorney fees.

An amended judgment reflecting the fee award was issued August 22, 2023.

**Appeal**

Welty filed his notice of appeal from the judgment on April 28, 2023. On September 6, 2023, he filed his notice of appeal from the amended judgment including the award of attorney fees and costs.

Thereafter, Welty's motion to consolidate the two appeals was granted by this court.

## DISCUSSION

### I. Contract interpretation proceedings[5]

Welty first addresses the court's February 8, 2022 decision on the contract interpretation issues, arguing the court erred in failing to follow principles of contract interpretation. Welty characterizes the court's actions as a refusal to consider extrinsic evidence at all, even provisionally, and takes the position the court "simply did not mention [Welty's] evidence, then excluded and refused to consider Welty's evidence." Welty argues these alleged errors resulted in severe prejudice to him.

The record does not support Welty's claims the court failed to follow proper principles of contract interpretation. Instead, the court specifically outlined the process of contractual interpretation, explaining, "the Court can provisionally and should maybe provisionally consider extrinsic evidence to determine if there's an ambiguity." The court then asked Welty's counsel, "If we go down that road, what's the plaintiff's position as to what extrinsic evidence should be provisionally considered?" Welty's counsel made a general reference to evidence included in their papers, including testimony, e-mails, and other documents submitted in the record. Welty's counsel was then pressed to specify "what extrinsic evidence do you believe [Welty] has proffered that the Court should consider?" Welty's counsel referenced exhibit 6. The court then asked, "Anything else that you believe the Court should provisionally consider?" Welty's counsel referenced exhibit 12.

---

[5] Welty organizes his brief in order of proceedings, raising challenges at each phase of litigation. We address his claims in the same order.

18

The court's written order outlines the process of consideration of extrinsic evidence in interpreting contracts, explaining: "First, the trial court preliminarily examines the proffered evidence to see if it is fairly susceptible of one of the interpretations advanced.  If so, the evidence is then admissible.  However, extrinsic evidence is not admissible to alter the terms of a written contract."  (Citing *Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.* (1988) 197 Cal.App.3d 1049, 1058.)

The court proceeded to evaluate the two exhibits specifically mentioned, concluding neither exhibit made the language in the GHAA reasonably susceptible to Welty's interpretation.  The court concluded its provisional consideration by stating, "Even if these exhibits were admitted, they would not support Welty's argument that the GHAA modified the term 'Masters' in the [SA] for the reasons set forth above."  Welty does not challenge the court's analysis nor provide any explanation as to how such evidence made the agreements reasonably susceptible to his interpretation.[6]

Welty argues he never narrowed, withdrew, or waived any evidence.  However, the court made it clear it was going to consider extrinsic evidence "only if it occurred either by statements or documents before the controversy arose."  Welty's

---

[6]    We decline to address Welty's argument made for the first time in his reply brief that the plain language of the SA supports Welty's interpretation.  (*Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1370 ["Raising a new theory in a reply brief is improper and unfair . . . .  We may decline to consider an argument raised for the first time in a reply brief if no good reason is demonstrated for the delay in raising the point."].)

counsel agreed with the court's approach, stating, "That's correct. That is to be given more weight as opposed to sort of post hoc rationalization." The court then made it clear it was narrowing the scope of extrinsic evidence to be considered, saying, "So with that additional consideration in mind, what extrinsic [evidence] do you believe plaintiff has proffered that the Court should consider?" Rather than objecting to the court's narrowed range of evidence to be considered, Welty's counsel proceeded to describe exhibits 6 and 12.

Welty now argues he later clarified his position was that all extrinsic evidence should be considered, including "all testimony, e-mails and other documents submitted in the record." The court explained, "That, of course, was your starting point . . . . And I trust you as to which particular exhibits, and you did that. And then later, as the opposing side points out, when I instructed them that the only two that you were relying on were 6 and 12, you did not object or in your closing comments make a further comment." The court concluded, "the transcript clearly shows that based on the court's specific questions to plaintiff's counsel, the proffer of extrinsic evidence was narrowed to two exhibits only upon which this court ruled in its statement of decision." At no time during the hearing did Welty's counsel raise additional specific items of evidence for the trial court to consider.

The trial court did not err in focusing its review on the two exhibits Welty identified. The court was not required to review "all testimony, e-mails and other documents" in the record without guidance from Welty as to the significance of such evidence in supporting his position. On appeal, Welty attempts to correct this omission, pointing to evidence in the record that he claims shows that during the formation of the GHAA,

respondents' lawyers interpreted the GHAA in a way similar to Welty and showing respondents' lawyers continually diminishing the amount owed to Welty. Welty fails to provide a citation to the record showing he alerted the court to these specific items of evidence.

Further, Welty fails to explain how the items of evidence he points to support his theory that the GHAA was meant to modify the meaning of the term "Masters" in the SA. Thus, Welty fails to establish the trial court's failure to provisionally consider the specific evidence referenced on appeal was prejudicial error.

We decline to find reversible error based on the court's procedure for contractual interpretation. Even if Welty has not forfeited this claim of error, or invited error by failing to direct the court's attention to the exhibits he now raises, he has failed to show that any such error was prejudicial. (Cal. Const., art. VI, § 13; *Robert v. Stanford University* (2014) 224 Cal.App.4th 67, 72 ["we may not reverse a judgment in the absence of a showing of prejudice"].)

## II. MSA proceedings

### A. *Permitting the MSA*

Welty first argues the trial court abused its discretion and violated Welty's due process rights when it permitted respondents to file the MSA after hearing the bifurcated contract interpretation issue.

Welty argues that the MSA was unauthorized due to its timing. Code of Civil Procedure section 437c, subdivision (a)(3) requires "[t]he motion shall be heard no later than 30 days before the date of trial, unless the court for good cause orders otherwise." Welty argues that trial commenced in January 2022 when the trial court heard the bifurcated contract interpretation

21

issue.  Welty asserts there is no authority for approval of an MSA after the court has started trial, even a bifurcated trial.  At no time did the court make any findings of good cause for an MSA to be filed.  Thus, Welty argues, the MSA was procedurally unauthorized.

The record shows the trial date was initially set for January 3, 2022.  At the December 17, 2021 status conference, that trial date was vacated, and the court set "Oral Argument Re Legal Issues" for January 28, 2022.  At a May 5, 2022 status conference, the court set respondents' MSA for hearing on August 17, 2022; a final status conference for September 30, 2022; and a bench trial on Welty's causes of action 6 and 7 for October 10, 2022.

The parties argue whether trial had technically begun at the time the court allowed the MSA.  However, Code of Civil Procedure section 437c, subdivision (a)(3) gives trial courts the discretion to hear a motion for summary adjudication for good cause even where "30 days before the date of trial" has passed.  Appellant argues the trial court in this matter never made an explicit finding of good cause.  However, this court may infer from the record such an implicit finding of good cause.  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 ["The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment."]; see also *North Carolina Dairy Foundation, Inc. v. Foremost-McKesson, Inc.* (1979) 92 Cal.App.3d 98, 104.)  A court need not always use the particular words "good cause" in making a finding of good cause.  (See, e.g., *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 561 ["While desirable, we do not

believe that the statute requires the incantation of the particular words 'good cause,' . . . ."].)

At the May 5, 2022 status conference, Welty's counsel argued, "I think the deadline for [an MSA] of those claims has passed because it's tied to the initial trial date." The court responded it had discretion to hear an MSA because "we vacated the first trial date and we haven't formally set even a new trial date on a bifurcated portion." Thus, the court concluded it had discretion to allow an MSA as long as it was properly noticed. The court later noted it had a "duty in managing the individual cases on this court's docket . . . to determine whether or not there are justiciable claims and whether or not those claims are barred by some theory or other." The court thus made an implicit determination that, regardless of how the January 2022 hearing is characterized, there was good cause to allow the MSA in order to potentially eliminate certain legal issues from trial. This is the purpose of the summary judgment law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [purpose of summary judgment law "is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute"].) Given the trial court record, we find the court made an implied finding of good cause to permit the MSA following the hearing on the contract interpretation issues in order to streamline the issues for trial.[7]

---

[7]     Welty's authorities on this issue do not contradict our decision here. *Urshan v. Musicians' Credit Union* (2004) 120 Cal.App.4th 758, 764, agrees that "a trial court has discretion to shorten the 30-day period in which a motion for summary judgment must be heard before trial where circumstances

23

Because the trial court made an implicit finding of good cause, we decline to address the parties' arguments whether trial had technically begun.  The court articulated good cause to hear the motion, and we decline to disturb its discretion.

## B.   *Denial of additional discovery*

Welty next argues the trial court abused its discretion by twice denying Welty's requests for additional discovery.

On May 11, 2022, respondents produced a new document, a heavily redacted copy of the SA, which respondents had provided to Round Hill in connection with the catalog sale.  Welty filed a motion to reopen discovery, or confirm discovery was still open, seeking "additional information related to the facts and circumstances surrounding the redacted agreement, why it was produced to Round Hill in redacted form instead of as a whole, and the reasoning for the specific redactions made."  Respondents

---

warrant."  And in *Robinson v. Woods* (2008) 168 Cal.App.4th 1258, the plaintiffs opposed a motion for summary judgment solely on notice grounds.  The hearing was set prior to 80 days after service by mail and within 30 days of trial with no showing of good cause.  (*Id.* at p. 1260.)  The court resolved the issue by continuing the hearing by four days and ruling, at the summary judgment hearing, that there had been good cause.  The Court of Appeal found that "[t]he four-day continuance was a violation of due process and an abuse of discretion," since the notice period had begun anew.  (*Id.* at p. 1268.)  In addition, the trial court did not find good cause for violation of the 30-day rule until the parties returned to court for the summary judgment hearing.  (*Ibid.*.)  Under those circumstances, reversal was required.  Here, in contrast, the court made its implicit finding of good cause over three months prior to the hearing on the MSA and prior to the filing of the MSA on June 3, 2022.

24

objected to the motion, arguing discovery had been closed for seven months; Welty had not established that any of the requested discovery was necessary; and had not established that he had diligently pursued such discovery.[8] On August 1, 2022, the trial court denied Welty's motion.

Under Code of Civil Procedure section 437c, subdivision (h), Welty renewed his request in his opposition to the MSA along with declarations and document requests. The declarations and document requests were excluded. The trial court sustained respondents' objection that the portion of the declaration related to discovery "seeks improper reconsideration of the Court's August 1, 2022 Order denying Mr. Welty's motion to reopen discovery." Respondents' sustained objection to the declaration also outlined the requirements of Code of Civil Procedure section 437c, subdivision (h) to reopen discovery and asserted that Welty had failed to meet those requirements. The court sustained respondents' objection to Welty's third set of requests for production as they were served roughly seven months after discovery closed.

The decision to grant or deny a motion to reopen discovery is within the discretion of the trial court. (*Cottini v. Enloe*

---

[8]    Code of Civil Procedure section 2024.050, subdivision (b) permits a court to grant a motion to reopen discovery upon consideration of (1) the necessity and the reasons for the discovery; (2) the diligence or lack of diligence of the party seeking the discovery; (3) any likelihood that permitting the discovery will prevent the case from going to trial on the date set; and (4) the length of time that has elapsed between any date previously set, and the date presently set, for the trial of the action.

25

*Medical Center* (2014) 226 Cal.App.4th 401, 418.) It is appellant's burden on appeal to show an abuse of discretion. (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 154.) Welty fails to articulate an abuse of discretion in the trial court's order. He points out that a party's inability to obtain discovery may constitute good cause to grant a continuance. He further argues there was no question as to his diligence as he had no reason to make the request for additional discovery until the belated production. He declines to address other pertinent factors, and therefore has failed to show an abuse of the trial court's discretion in declining to permit additional discovery.[9]

### C. *Exclusion of evidence*

Welty next contends the trial court abused its discretion in sustaining respondents' objections to much of Welty's evidence opposing the MSA. Welty largely fails to address specific evidentiary objections or explain why the specific evidentiary objections were inapplicable. He makes no legal argument regarding many of the objections respondents made and whether the court properly ruled on those objections. Welty has waived

---

[9]    *Denton v. City and County of San Francisco* (2017) 16 Cal.App.5th 779, 791, cited for the first time in Welty's reply brief, is distinguishable as the defendants refused to recognize a previous settlement after the plaintiff had discharged his attorney. The plaintiff was "surprised that the summary [judgment] motion was being heard on that date and he needed additional time to seek new counsel to help oppose the motion if he could not settle." (*Id.* at p. 792.) This was not the position that Welty was in when he sought additional discovery in this matter.

any objections to the court's evidentiary rulings where he has failed to provide detailed argument concerning the grounds for exclusion of evidence and the reason such grounds were incorrect.[10] (*Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1022 ["'"[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration."'"].)

### 1. *Opposition papers*

Welty argues the trial court erred in striking his separate statement. However, Welty fails to point to a citation in the record showing his separate statement was stricken. Instead, the record shows the trial court considered Welty's separate statement, but concluded it failed to raise disputed issues of material fact due to its reliance on improper objections, arguments, and inadmissible evidence.[11] As to the catalog sale issue, Welty failed to object to respondents' evidence concerning the amount due to Welty and failed to provide admissible evidence that respondents' calculation was incorrect.

The trial court noted Welty admitted his opposing separate statement and additional material facts were irrelevant because

---

[10] Welty's specific arguments regarding the report of Leoni, course of performance evidence, and intent of the parties are discussed in more detail below.

[11] The court noted Code of Civil Procedure section 437c, subdivision (b)(3) permits a trial court to grant a motion for summary adjudication where the opposition fails to comply with the requirements of the statute, including failure to reference supporting evidence. However, the court did not appear to rely on this provision in granting the MSA.

Welty's opposition brief completely failed to reference those documents. Welty admits the opposing brief cited evidence, rather than citing the separate statement, but argues a trial court does not have the discretion to enter a judgment against a party solely as a result of that party's provision of a defective separate statement. (Citing *Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1215.) The court's order shows it did not grant the MSA solely on the ground of Welty's deficient separate statement. Rather, the trial court granted the MSA on the contract interpretation issue because it found Welty did not raise a triable issue of material fact as to the breach of contract claim regarding the catalog sale.[12] Under the circumstances, we decline to find error.

---

[12] The trial court expressed its frustration at the noncompliant papers at the hearing, stating, "summary judgment jurisprudence is pretty particular, and the requirements are pretty stringent, and it's designed as a mechanism for the court to cut through the pleadings to determine whether or not there are genuine and material triable issues. So that shows the importance of a separate statement, the tendering of admissible evidence, the referral of the evidence in the referral to the relevant evidence in the points and authorities, so the court doesn't have to do the work of a party or parties and try to figure out where in a two-inch stack of documents there may be evidence that properly raises a material issue of fact. That's not the court's function." At that time, Welty's counsel requested that the court refrain from ruling on the MSA until after the trial of the accounting claim, which the court denied. Welty's counsel did not deny the opposition papers were noncompliant, nor make any legal argument that the court should not consider the technical errors in the papers.

28

## 2. *Report of Vince Leoni*

Leoni was Welty's designated expert, and his report was submitted in support of Welty's opposition to respondents' MSA. In his declaration filed in support of the opposition to the MSA, Welty's attorney attested that the attached document was "a true and correct copy of the Expert Report of designated expert Vincent Leoni produced in this action." The report did not include Leoni's name anywhere, but was written on the letterhead of "Miller Kaplan." The report "included an analysis of the various royalty streams the Offspring is contractually obligated to account to Welty as well as the calculation of Welty's share of the sale of the recorded masters of the Offspring." The report concluded that such accountings and proceeds were not properly calculated according to the terms of the SA.

Respondents objected to the admission of the report on the ground it was inadmissible hearsay under Evidence Code section 1200, lacked foundation under Evidence Code section 403, and constituted an improper expert opinion under Evidence Code sections 720 and 801. Respondents elaborated on these objections, explaining, "This supposed expert report is not signed and not certified under penalty of perjury. [Citation.] [¶] Its author is also not identified, nor are his or her qualifications to provide expert testimony. [¶] No foundation is laid for any of the information in the attached schedules." The trial court sustained respondents' objections.

At the hearing, Welty's counsel offered to have Leoni cure the defect and provide a declaration, so it could provide a triable issue of material fact on the first issue concerning the Test Period Fraction. The trial court responded, "an oral request to supplement the papers at this late date is just really a

29

nonstarter." Welty's counsel suggested the matter was a technical issue, but the trial court disagreed, stating "it's not technical because the question is, is there a material issue of fact." The court then redirected counsel to point out the material disputed issues of fact.

On appeal, Welty addresses only respondents' objection that Leoni's report was not signed under penalty of perjury, claiming this objection was not legitimate. Welty argues respondents had also referenced Leoni's report, and the trial court made reference to utilizing Leoni's testimony in the future. Welty argues Leoni's report was not a surprise. Welty's argument does not convince us that the trial court abused its discretion in sustaining respondents' objections to the report during the MSA proceedings. Welty fails to address the other two objections or to address any of the specific Evidence Code sections cited. Welty provides no legal authority suggesting the trial court abused its discretion in not permitting Welty an opportunity, at the time of the MSA hearing, to cure the defects in Leoni's report.

Welty cites *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364, footnote 16, for the proposition that "[t]erminating sanctions such as an order granting summary judgment based upon procedural error "'have been held to be an abuse of discretion unless the party's violation of the procedural rule was willful [citations] or, if not willful, at least preceded by a history of abuse of pretrial procedures, or a showing [that] less severe sanctions would not produce compliance with the procedural rule.'"'" *Elkins* involved a trial court that excluded the bulk of a litigant's evidence for noncompliance with the court's scheduling order. The Supreme court concluded, "the trial court abused its

discretion in sanctioning petitioner by excluding the bulk of his evidence simply because he failed, prior to trial, to file a declaration establishing the admissibility of his trial evidence. The sanction was disproportionate and inconsistent with the policy favoring determination of cases on their merits." (*Id.* at pp. 1363-1364.)

Here, Welty is challenging the sustaining of an objection to a single piece of evidence. The objections were sustained on three grounds that Welty fails to address. He has not shown respondents' MSA was granted on the first issue solely because this report was excluded. In sum, the suggestion the inadmissibility of Leoni's report was equivalent to terminating sanctions is not supported on this record. Welty has failed to show the trial court abused its discretion in excluding the report and fails to show prejudice from the exclusion.

**3.** *Course of performance evidence*

Welty argues the trial court excluded evidence of course of performance prior to the time disputes arose. However, it is unclear what specific evidence Welty is referring to or what legal arguments he makes regarding the specific Evidence Code sections under which the objections were sustained.

Welty first complains the trial court sustained respondents' objection to his offering of a letter from Attorney Paterno. However, the reference to the Paterno letter is contained in a lengthy paragraph to which respondents objected on six different grounds. Welty fails to address these legal grounds for exclusion of evidence. Instead, he complains the trial court admitted the same document when offered by respondents. Welty does not contest the trial court's justification that Welty had not objected to it. Under the circumstances, we have no basis to find the trial

31

court abused its discretion in sustaining respondents' objections to this portion of Welty's evidence.

Welty argues he sought to refer to the Paterno declaration to show it conflicted with prior performance and course of dealing. He provides a citation to two pages of Welty's declaration, but fails to explain the basis for the court's decision to sustain respondents' objections to these pages, nor does he provide legal argument refuting such bases. Instead, Welty appears to take the position the court simply erred in excluding this evidence because it was relevant. Welty cites *Walter E. Heller Western, Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158, for the proposition that "parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory." Welty fails to provide a citation to the record showing that any specific course of performance evidence was excluded solely on the grounds of relevance. He has failed to show an abuse of discretion.

####  4.      *Intent of the parties*

The last category of evidence Welty raises is evidence of intent of the parties. Again, he argues such evidence was relevant, citing *Piedmont Capital Management, L.L.C. v. McElfish* (2023) 94 Cal.App.5th 961, 969, for the proposition that the court was not free to disregard extrinsic evidence of the parties' intent in interpreting a contract. Welty also relies on *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1359, in which summary judgment was reversed in part because triable issues of fact remained concerning a certain contractual term. Neither case assists Welty's argument. Again, Welty refers to portions of two declarations, but fails to discuss—or provide

32

citations to the record showing—the specific Evidence Code sections supporting exclusion of this evidence and making legal arguments refuting such reasoning. He has failed to show an abuse of discretion in the trial court's exclusion of any specific evidence.

### D. *Grounds for grant of MSA*

Welty argues the trial court granted the MSA on grounds that were not contained in the notice, as respondents moved for summary adjudication of the entire claim for "breach of contract based on an alleged underpayment from the band's 2015 catalog sale because it is based on an erroneous interpretation of the contract"; however, respondents' supporting brief and separate statement addressed only the Test Period Fraction issue. Welty argues the trial court's decision to grant summary adjudication "solely on the theory that [Welty] was underpaid on the Round Hill deal" was impermissible, as it represented a single item of compensatory damage.

Welty cites *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 422, for the proposition that "Code of Civil Procedure section 437c, subdivision (f)(1), does not permit summary adjudication of a single item of compensatory damage which does not dispose of an entire cause of action." *DeCastro* involved summary adjudication of a single item of compensatory damages stemming from a legal malpractice claim. The present matter is distinguishable. It does not involve a single item of damages, but a contractual theory of recovery. As the trial court noted, "under subdivision (f) of section 437c, a party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the

33

same cause of action." (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855 (*Lilienthal*); see *Blue Mountain Enterprises, LLC v. Owen* (2022) 74 Cal.App.5th 537, 549 ["to the extent the FAC's first cause of action alleged separate and distinct contractual violations, Blue Mountain was entitled to present a motion for summary adjudication as to any alleged violation"].)

Welty cites *Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1094, footnote 2, which questioned whether the *Lilienthal* court properly interpreted Code of Civil Procedure section 437c, subdivision (f)(1) in light of subsequent statutory amendments. In *Bagley*, a defendant moved for summary adjudication of 130 "issues" attacking the plaintiff's seven causes of action. (*Bagley, supra*, at p. 1093.) However, the question of whether the 130-issue motion for summary adjudication was permissible was not before the *Bagley* court, therefore we are not persuaded by the dicta in the footnote cited.[13]

---

[13]     *Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1364, also does not convince us the MSA in this matter was inappropriate.  The *Skrbina* court noted that "if a plaintiff states several purported causes of action which allege an invasion of the same primary right he has actually stated only one cause of action.  On the other hand, if a plaintiff alleges that the defendant's single wrongful act invaded two different primary rights, he has stated two causes of action, and this is so even though the two invasions are pleaded in a single count of the complaint." (*Ibid.*)  Here, Welty stated several different acts supporting his breach of contract cause of action.  The trial court did not err in treating the Test Period Fraction issue as a distinct issue appropriate for summary adjudication.

**E.    *Breach of fiduciary duty/conversion claims***

Welty challenges the trial court's decision to grant respondents' MSA on his breach of fiduciary duty and conversion claims on substantive legal grounds.

While acknowledging *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 30-31, which held "the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship . . . ," Welty requests we consider Justice Johnson's concurrence in the matter. Welty fails to elaborate on how the concurrence assists his claim or provide any reasoned analysis of the case. We therefore decline to consider the concurrence. Welty cites *Stevens v. Marco* (1956) 147 Cal.App.2d 357 and *Schaake v. Eagle Automatic Can Co.* (1902) 135 Cal. 472 as cases involving royalties that permitted claims for breach of fiduciary duty. However, again Welty provides no analysis of the cases or legal argument. We therefore again decline to find error in the trial court's decision.

As to the conversion claim, Welty argues it was improperly dismissed solely on the pleadings. The record reveals otherwise, as Welty had the opportunity to present evidence in support of the conversion claim in opposition to the MSA. Welty complains his evidence in support of his conversion claim was excluded, but fails to challenge any specific evidentiary rulings. Welty cites no legal authority.[14] Under the circumstances, we decline to find substantive error in the trial court's ruling.

---

[14]    For the first time in his reply brief, Welty cites *Fong v. East West Bank* (2018) 19 Cal.App.5th 224, 231, quoting *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 209, for the proposition that "'[m]oney may be the subject of conversion if the

35

## III. Catalog sale claims

Welty argues the trial court dismissed certain of his catalog sale claims sua sponte. He argues respondents did not request summary adjudication of any of his contract claims other than the Test Period Fraction issue. Welty adds he had no notice that respondents were seeking summary adjudication of the catalog sale claims as they related to his other claims, including breach of contract, accounting, breach of the implied covenant of good faith and fair dealing, and declaratory relief. Thus, Welty argues, the court lacked authority to grant summary adjudication of catalog sale claims other than the Test Period Fraction issue. Welty cites *Moore v. California Minerals Products Corp.* (1953) 115 Cal.App.2d 834, 836, for the proposition that dismissing a party's claims without notice or request from another party is a form of structural error that is per se reversible.

This record does not indicate the court dismissed any causes of action sua sponte nor granted summary judgment on any claims not raised by respondents. Welty makes a general citation to the September 30, 2022 conference, but fails to provide page citations supporting his position his claims were dismissed. The September 30, 2022 hearing was a pretrial conference at which the court reviewed pretrial briefs and a joint witness list. The court addressed Welty's argument that his claim he was underpaid on the catalog sale "is still alive in two of the equitable claims, via declaratory relief and the accounting claim," by

claim involves a specific, identifiable sum.'" The case does not address the court's rationale for granting summary adjudication on the conversion claim, nor did Welty's myriad claims amount to a specific sum.

disagreeing the Test Period Fraction issue could form the basis for these two causes of action because "[a]ccounting has to be tethered to something.  There has to be some relationship or duty as between the parties.  We don't have accounting trials when there is no basis for the breach for the allegation of duty."

Welty's counsel disagreed to the scope of the MSA, to which the court responded, "Issue No. 1 in the motion for summary adjudication was, and I quote: [Respondents] are entitled to summary adjudication of Welty's First Cause of Action for breach of contract based on an alleged underpayment from the band's 2015 catalog sale because it is based on an erroneous interpretation of the contract, and therefore Welty cannot establish the essential element of breach as a matter of law . . . ." The court concluded, "I determined that there were not triable issues of fact, for a variety of reasons, and that the defendants were entitled on this precise issue to judgment in their favor, which is, there was no underpayment on the 2015 catalog sale." The court was not persuaded there were remaining issues on the catalog sale claim, concluding, "I think that having ruled on the breach of contract issue, solely with respect to the 2015 catalog sale, that's off the table for a trial and for the accounting."  The court specified the accounting and declaratory relief causes of action would proceed on Welty's third party issues, not the Round Hill sale.

The record supports the trial court's determination the catalog sale claim had been heard and determined in the contract interpretation hearing.  The trial court heard and determined contractual interpretation on a single issue: breach of contract "solely on the theory that [Welty] was underpaid on the Round

37

Hill deal."[15]  Welty was not entitled to have this theory of underpayment heard again under the guise of different causes of action.[16]

Case law also supports the trial court's determination the issues decided against Welty in the MSA could not be determined again in connection with Welty's other causes of action.  As to the declaratory relief cause of action, it could not be used to renew the issues already decided in the MSA.  (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 324 [when "[t]he issues invoked in [a declaratory relief] cause of action already were fully engaged by other causes of action . . . , declaratory relief was unnecessary and superfluous"].)  Similarly, an accounting action is superfluous when the issues raised may be "folded into" a breach of contract cause of action.  (*Fleet v. Bank of America N.A.* (2014) 229 Cal.App.4th 1403, 1414.)  Finally, breach of the implied covenant of good faith and fair dealing "will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself."  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1120.)  Because the trial court determined as a matter of law that respondents did not breach the SA by means of underpayment to Welty on the

---

[15]  As set forth above, the record reveals the trial court permitted the parties to brief the contract interpretation issues as they chose on the catalog sale issue.  The issue was narrowed by the parties, who filed simultaneous briefs on contract interpretation.

[16]  As set forth below, the trial court later addressed Welty's theory the $35 million was unfairly allocated as between the recordings and the publishing, known as the "M/P allocation" issue.

catalog sale, Welty was not entitled to have the issue revived under the caption of any other cause of action.[17]

## IV.    Denial of leave to amend

On October 4, 2022, approximately two weeks prior to the scheduled trial date and over two years after he filed this litigation, Welty sought to file a first amended complaint.  The matter was set for hearing on October 26, 2022, but instead was heard on the first day of trial, October 17, 2022.

In the motion, Welty sought to add new theories of the case, including new theories of contract interpretation concerning the Test Period Fraction issue and the catalog sale.

On the first day of trial, the trial court announced its tentative decision to deny the motion to amend the complaint, explaining, "I'm particularly persuaded [because the] issue which has percolated throughout the course of these proceedings was resolved via the briefing and the court's ruling back on February 8, 2022. . . .  I'm not inclined at this very late date to reopen the pleadings to allow that theory once again to be visited and evidence to be taken on it."  Welty's counsel explained Welty's position the precise issues raised in the amendments were not addressed in the previous briefing regarding contract interpretation, to which the trial court responded, "if your

---

[17]    *Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, cited for the first time in Welty's reply brief, is distinguishable.  In *Kemp*, the trial court granted a pretrial right to attachment order, finding probable validity of the claim on the ground of prior litigation involving a Los Angeles Unified School District hearing officer.  (*Id.* at p. 1477.)  Unlike *Kemp*, the trial court here was referring to prior proceedings in this case—not unrelated litigation.

39

predecessor counsel emphasized one part or two . . . in the voluminous briefing that I had, you know, that's a tactical decision that your client has to live with. [¶] . . . [¶] . . . I did not constrain either side as to the briefing at all." Concerning the allocation of assets under the catalog sale, the court stated, "both sides had a full opportunity to brief that."

A trial court has wide discretion in deciding whether to permit amendment of a pleading. (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 175 (*Melican*).) Generally, we will not reverse such a determination unless a manifest abuse of discretion is shown. (*Ibid.*)

Welty's arguments focus on lack of prejudice to respondents in permitting him to amend his complaint. Welty argues respondents could not have been surprised when Welty sought leave to allege the new theories, and he was not adding new claims but seeking to conform to what the evidence in the case demonstrated. He also asserts the timing did not prejudice respondents because the bifurcated trial had not yet begun and there was no jury waiting.

Respondents argue they were prejudiced by the potential for an amended complaint with new theories after two years of litigation. In addition, lack of prejudice is not the only thing a court considers when deciding whether to grant or deny a motion to amend a complaint. A court may also consider "'"unwarranted delay,"'" which may alone constitute "'"a valid reason for denial"'" of leave to amend. (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345; see *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 487-488.) The trial court acted within its discretion in denying Welty leave to amend his complaint on the eve of trial to add new theories two

years into the litigation, after a full hearing on the issue of the catalog sale.

The cases Welty cites do not convince us the trial court abused its discretion in this matter. In *Tung v. Chicago Title Co.* (2021) 63 Cal.App.5th 734, 742, the plaintiff moved to amend his complaint to plead attorney fees as damage. In light of the last minute nature of the amendment, the trial court denied the motion. (*Id.* at p. 743.) The *Tung* court reversed, finding "significant evidence" that opposing counsel "was very aware of Tung's intent to pursue attorney fees as damages and sought through discovery to clarify the amount of such attorney fees as damages . . . ." (*Id.* at p. 752.) Because opposing counsel was "fully aware" of "the theory of liability upon which Tung was proceeding and the potential for an award of damages for attorney fees" (*id.* at p. 756), the *Tung* court found an abuse of discretion.

The circumstances before us are different. Not only was Welty presenting new formulas for calculation of Welty's share of the catalog sale proceeds, there had been a full hearing on contract interpretation where Welty was permitted to brief the issue. Therefore *Tung* is not persuasive.

*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739 is also distinguishable. The plaintiff moved to amend to add four causes of action and simultaneously moved to continue trial. (*Id.* at p. 743.) The opposition argued the plaintiff was "'simply trying to circumvent the trial court's clear ruling' on summary adjudication that as a matter of law there had been no misrepresentations by Elk that its roof shingles were defect free." (*Id.* at p. 760.) In determining the trial court abused its discretion in denying these motions, the *Atkinson* court noted,

41

"Elk has not claimed that it will be prejudiced by this amendment," and concluded, "'[i]t is an abuse of discretion to deny leave to amend where the opposing party was not misled or prejudiced by the amendment.'" (*Id.* at p. 761.) In this matter, respondents claimed prejudice, and the trial court found the amendment to be prejudicial given the complex prior proceedings that had already occurred.

Finally, Welty distinguishes *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, where a litigant moved to amend his complaint more than two years after he filed it and on the fourth day of a five-day trial. The *Duchrow* court explained the cases on amending pleadings during trial emphasize two general principles: "'"(1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment."'" (*Id.* at p. 1378.) The *Duchrow* court concluded that both had occurred there.

The court here appropriately considered Welty's delay in presenting his new theories regarding the catalog sale issue, particularly in light of the earlier briefing and hearing on the matter. Under the circumstances, we decline to find an abuse of discretion in the trial court's determination the proposed amendment, brought at such a late date, prejudiced respondents. "'"[A]s a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown."'" (*Melican, supra*, 151 Cal.App.4th at p. 175.) Given Welty's delay in bringing the motion to amend, and his earlier opportunities to make respondents aware of his theories and oppose them, we cannot find the trial court abused its discretion in disallowing Welty's amendment such a short time before trial.

## V.    Asset allocation; M/P allocation; recoupment

Welty takes the position the trial court erred in summarily disposing of his alternative theories of underpayment on the Round Hill deal. Those theories were the "asset allocation" issue and the "M/P allocation" issue. He also argues the court summarily disposed of the "recoupment" issue. Welty has failed to show the trial court dismissed these claims without consideration and further has failed to show error.

### A.    *Asset allocation issue*

The asset allocation issue is Welty's claim that respondents unfairly allocated the $20 million catalog sales proceeds as among the catalog assets without any contractual basis. This issue is discussed above in part III, as it was part of Welty's argument the trial court dismissed his catalog sale claims "sua sponte."

In response to Welty's argument the trial court should hear and consider the asset allocation issue, Welty's counsel argued this issue was not briefed as part of the contract interpretation hearing. The court stated, "I did not constrain either side as to the briefing at all." In sum, the trial court found that Welty had forfeited the issue by failing to raise it in connection with the contract interpretation hearing. Welty fails to provide any support for his argument that the trial court failed to address this issue.

Welty does not directly address the trial court's ruling he essentially forfeited this claim by failing to raise it during the contract interpretation hearing on catalog sale underpayment. Instead, he relies on his position the trial court dismissed such claims. However, the record shows the trial court gave the parties the opportunity to raise any contract issues in the

43

extensive, simultaneously filed briefing prior to the hearing on contract interpretation.  By failing to address the trial court's rationale for declining to hear the asset allocation issue after the contract interpretation hearing, Welty has failed to convince this court of error.

### B.    *M/P allocation issue*

The M/P allocation issue concerned Welty's position that respondents "had an implied duty to correctly allocate the total $35,000,000 as between the masters and the publishing."  He also contended there was a factual dispute as to "whether they had fairly allocated an additional $1,000,000 that [respondents] demanded from Round Hill, which was allocated 100% to Holland."

In the statement of decision for the phase 1 trial, the court wrote: "At the (second) Final Status Conference on October 7, 2022, the Court clarified that Phase I of the trial would address: (1) Welty's theory that the Round Hill deal was actually for $35 million and that Welty was entitled to a portion of the $15 million [respondent] Holland was paid for his publishing catalog and (2) Welty's theory that [respondents] failed to account to [Welty] for his share of royalties from other third parties."  In the statement of decision, the trial court addressed the M/P allocation issue, concluding that Welty failed to meet his burden of proof on the issue.  The court noted Welty failed to provide evidence and instead only provided speculation that the assets purchased by Round Hill were designed to deprive him of his fair share.  There was competing evidence presented by respondents that the deal was structured in accordance with industry standards.  Further, pursuant to the terms of the SA, "the band had the sole and absolute discretion to exploit (or not exploit) the masters 'in any

44

manner [the band] determine[ed].'" For these reasons, the trial court rejected Welty's M/P allocation claim.

The record does not support Welty's position the claim was not heard and decided by the trial court.

## C.     *The recoupment issue*

The recoupment issue is described as respondents' retention of Welty's earned royalties to pay down respondents' substantial advances rather than paying him what he was owed. The issue involved Sony. The record shows the trial court did not dismiss this claim, as Welty suggests. Instead, the court heard and considered evidence on the issue and ultimately ruled based on its view of the evidence. The court commented Welty's claim was based primarily on the analysis and opinions of Ferguson.[18] The trial court observed Ferguson was "a demonstrably biased witness." The court referenced an e-mail exchange of Ferguson's and noted "Ferguson's demeanor and responses to questions also demonstrated her lack of objectivity in this case." After reviewing the testimony, the court concluded, "Ferguson's opinion that Welty had been or should have been recouped by Sony is rejected. No Sony witness was called to corroborate her. Further, Ferguson was not properly designated as an expert. Her opinion was based on her purported review of Sony records which were never admitted in evidence." The court further rejected Welty's position that because Sony failed to directly account to Welty for his share of royalties, such obligation fell to the band.

---

[18]     As explained above, Ferguson was The Offspring's business manager until February 2010, and became Welty's manager in 2003.

Nothing cited by Welty could support his position the band had such an obligation.

Thus, contrary to Welty's position, the court considered and relied on evidence in reaching its conclusion on the recoupment issue. Welty has not presented a substantial evidence challenge, instead arguing the claim was improperly dismissed. No improper dismissal occurred.

## VI. Additional evidentiary rulings

Finally, Welty challenges additional evidentiary rulings. Welty's main argument concerns the court's treatment of Ferguson's testimony, which was critical to his case. A trial court's evidentiary rulings during a bench trial are reviewed for abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) "This standard is not met by merely arguing that a different ruling would have been better." (*Ibid.*) "In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion." (*Ibid.*)

Welty has failed to do so here. He references generally the exclusion of Ferguson's "opinions on the meaning of contractual terms," which the court found to be "irrelevant and inadmissible." However, Welty fails to provide legal support or discussion for his position the trial court's ruling was an abuse of discretion. Welty next criticizes the court's credibility determination that Ferguson was biased and lacked credibility. The court noted, "after she was terminated by the band she spent 10 or 12 years and a hundred thousand dollars of [Welty's] money coming up with her theory of the case, and it sounds like she was on a mission." Welty argues, "if the court was going to weigh witness credibility, it should have convened a jury to determine who was telling the truth." There is no indication in the record that Welty asked for

46

a jury at this stage of the litigation or that the trial court acted improperly in assessing witness credibility during the bench trial.

Welty further asserts the court's rulings excluding testimony were inconsistent and arbitrarily applied to Welty. He points out the court excluded, as improper expert testimony, most of Ferguson's testimony, which she prepared as Welty's business manager. The court also excluded testimony on Ferguson's tracking of royalties for Welty while she worked for respondents from 2003-2010. Welty fails to discuss the grounds for exclusion of such testimony or make legal argument as to why the exclusion was improper. However, Welty argues that respondents were permitted to provide undesignated expert testimony over Welty's objection, such as evidence of industry standards. In support of his position the court's rulings were error, Welty cites *Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at page 1127, but fails to provide any analysis of the case and how it applies in this matter.

Welty argues that although Leoni's invoices were admitted, it was error to exclude other evidence about the costs of performing the accounting. Welty appears to argue he was entitled to those costs as damages. Welty cites no legal support for this argument. He does not provide reference to the legal basis for the trial court's ruling nor a direct refutation of that legal basis. He has failed to show an abuse of discretion.

Welty makes the same unsupported argument with respect to prejudgment interest on payments made to Welty. There is no discussion of the trial court's rationale nor is there reference to any legal authority. Welty has failed to meet his burden of showing an abuse of discretion occurred.

## VII. Attorney fees and costs

Welty challenges the trial court's postjudgment order granting attorney fees and costs to respondents pursuant to a prevailing party fee provision in the SA. Welty does not dispute respondents were the prevailing parties or that they were entitled to attorney fees and costs. The standard of review on issues of attorney fees and costs is abuse of discretion. (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882.) "'"The trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice."'" (*Ibid.*)

First, Welty argues that respondents seeking and being awarded fees for two percipient witnesses was unprecedented. Welty does not name the witnesses nor discuss their role in the litigation. Welty cites a portion of his opposition to respondents' motion for attorney fees in which it is revealed that the subject witnesses were attorneys, Paterno and Soriano. Welty's citation to his brief in the lower court, without further elaboration, does not show an abuse of discretion.

Welty next challenges paralegal time for block-billed administrative tasks such as uploading documents, claiming such charges should have been reduced, and citing *Missouri v. Jenkins by Agyei* (1989) 491 U.S. 274, 288. The case citation does not support Welty's position the trial court abused its discretion in this matter, nor does Welty provide reasoned analysis of the issue.

Welty argues that attorney time was improperly billed in quarter-hour increments, citing *Welch v. Metropolitan Life Ins. Co.* (9th Cir. 2007) 480 F.3d 942, 949. *Welch* does not support

48

Welty's argument the trial court abused its discretion in this case. The *Welch* court noted the district court "imposed a 20 percent across-the-board reduction on Welch's requested hours because [her attorneys] billed in quarter-hour increments." (*Id.* at p. 948.) The court conceded, "[t]he district court was in the best position to determine in the first instance whether counsel's practice of billing by the quarter-hour resulted in a request for compensation for hours not reasonably expended on the litigation." (*Ibid.*) Similarly here, the trial court was in the best position to determine whether the quarter-hour billing system resulted in bills that were higher than they should have been. The California State Bar Committee's "suggestion" to the contrary does not lead us to find an abuse of discretion on the record before us.[19]

The trial court also concluded Holland's and Wasserman's "two 998 offers," which Welty turned down, "were sufficiently

---

[19] Welty cites two cases for the first time in his reply brief. Neither convinces us the trial court abused its discretion here. *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 694, involved a denial of attorney fees that was affirmed on the ground the trial court did not abuse its discretion in denying fees where the moving party "failed to meet his burden of establishing the amount of his reimbursable fees and costs" due to block billing. Like the *Nassimi* court, we leave it to the trial court's discretion as to whether the moving party has adequately supported the relevant fee request. In *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 158, the Court of Appeal concluded there was no reasonable basis for the trial court to deny compensation for administrative work that is normally compensable. Here, the trial court outlined the basis for the attorney fee award and was apparently not impeded in its analysis by block billing.

certain and specific." Welty disagrees, arguing respondents did not show the offers were drafted with sufficient precision. He then lists a series of questions he calls "unanswered and ignored ambiguities" in the offers. Welty cites *Burch v. Children's Hospital of Orange County Thrift Stores, Inc.* (2003) 109 Cal.App.4th 537, 545, as support for his position that respondents' failure to make the offers jointly, and failure to make other entities jointly and severally liable, rendered the offers invalid. Again, Welty fails to provide legal analysis of the case, or explain how it applies to the current matter. In *Burch*, a Code of Civil Procedure section 998 offer made by a plaintiff was deemed invalid because it was not expressly apportioned among all four defendants in the case. (*Burch*, at p. 547.) That is not the situation here, where two of the respondents made offers to Welty, the sole plaintiff.

Welty complains both offers contained a provision requiring that each party bear his or its own costs and attorney fees. Welty provides no legal authority suggesting such a provision renders the Code of Civil Procedure section 998 offer uncertain. He also points out there was no settlement agreement or release attached to the offers, creating further ambiguity. The authorities Welty cites in support of his position this rendered the offers fatally uncertain is not supported by the citations referenced.

In reviewing the trial court's award of costs pursuant to Code of Civil Procedure section 998, the applicable standard is abuse of discretion. (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1482.) Unless clear abuse is shown, this court will not substitute its opinion for that of the trial court. (*Ibid.*) Welty has failed to show that the trial court could not have reasonably concluded that Holland's and Wasserman's Code of

50

Civil Procedure section 998 offers were sufficient.  Having presided over the proceedings, the trial court was in the best position to evaluate the offers.  Welty has failed to show that the trial court abused its discretion.

## DISPOSITION

The judgment and order are affirmed.  Respondents are awarded their costs of appeal.

_____

CHAVEZ, J.

We concur:

_____

LUI, P. J.

_____

ASHMANN-GERST, J.